UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT, <br><br> Plaintiff, <br><br> v. <br><br> GENERAL DYNAMICS CORPORATION, LOCKHEED MARTIN CORPORATION, <br><br> Defendants. | Civil No.07-1955-GPC(WVG) <br><br> ORDER REGARDING PLAINTIFF'S LIABILITY FOR ONE-THIRD OF INVESTIGATION COSTS AT THE TOW BASIN SITE <br><br> (DOC. NO. 51) |

On July 12, 2013, the Court ordered Plaintiff San Diego Unified Port District ("Plaintiff" or "Port") and Defendants General Dynamics Corporation and Lockheed Martin Corporation ("Defendants") to file briefs regarding Plaintiff's liability for one-third of the investigation costs at the Tow Basin Site ("Site"). On August 9, 2013, Defendants filed their Opening Brief. On August 16, 2013, Plaintiff filed its Opposition to Defendants' Opening Brief. On August 23, 2013, Defendants filed a Reply to

Plaintiff's Opposition. On September 9, 2013, the Court held a hearing regarding this matter.

      The Court, having reviewed the Moving, Opposition, and Reply papers, and having heard oral argument, and GOOD CAUSE APPEARING, HEREBY FINDS AND ORDERS as follows:

      A. <u>1998 Cost Allocation Agreement</u>

      On January 9, 1998, the California Department of Toxic Substances Control ("DTSC") issued an Imminent Or Substantial Endangerment Determination & Remedial Order ("Order") (Defendant's Opening Brief, Exh. A). The Order required the parties to investigate "the nature and full extent of hazardous substance contamination of air, soil, surface, water, and groundwater at the Site, including offsite areas affected by the Site, as well as to perform any remedial action necessary to address such contamination. (Defendant's Opening Brief, Exh. A, §§ 5.1.1, 5.1.2, 5.2).

      After the Order was issued, in July 1998, the parties entered into an Interim Settlement & Participation Agreement ("1998 Agreement") (Defendant's Opening Brief, Exh. B). In this Agreement, the parties agreed to cooperate in the investigation and cleanup of the hazardous substances at the Site and to split costs associated with the Site investigation in equal one-third shares. (Defendant's Opening Brief, Exh. B, para. 2, 3, 6).

      The parties agreed that if the Port's portion of costs exceeded $150,000, then prior approval of the Port

Commissioners must be obtained. (Defendant's Opening Brief, Exh. B, paras. 2, 3)

The allocations set forth for cleanup were final and are not subject to appeal, arbitration or any other further action by any party. The parties waived their rights to a jury trial as to any dispute arising from the allocation. (Defendant's Opening Brief, Exh. B, para. 5).

The 1998 Agreement also contains the following clauses:

> To facilitate payment of the investigative, removal and remediation costs identified in this Agreement, the Parties agree that the Contractor responsible for conducting the work shall be required to send copies of its invoices to each party at least 45 days prior to payment being due. *Each party shall be responsible for the timely payment of its share directly to the Contractor.*
> *Each Party's timely payment to the Contractor is an independent obligation.* If any Party(ies) fails/fail to pay its/their full share or any portion thereof in a timely manner, the other Party(ies) [the 'Paying Party(ies)'] shall make such payment in equal share so that the Contractor is paid in full within ninety days of the date of the original invoice.
> *Any party that fails to pay its full share in a timely manner will be in breach of this agreement. The Paying Party(ies) shall have the right to seek recovery of such payment, interest, cost and attorney fees in a civil action for reimbursement from the non-Paying Party(ies) notwithstanding the provisions set out in Paragraph 2 of Article 1 herein.*[1/]

(Defendants' Opening Brief, Exh. B, para. 21)(emphasis added).

---

[1/] Paragraph 2 of Article 1 refers to Defendants' Opening Brief, Exh. B, para. 2, in which the parties agreed to split the costs associated with the Site investigation in equal one-third shares.

B. <u>2006 Interim Cost Sharing Agreement</u>

After the Port filed suit against Defendants, and after mediation, the parties entered into the 2006 Interim Cost Sharing Agreement (Defendant's Opening Brief, Exh. C) wherein the parties agreed to each pay one-third of the groundwater and sediment investigation costs, subject to the Port's seeking an agreement from its insurers that the insurers will pay the Port's one-third share of the costs. If the insurers did not agree to pay the Port's one-third share, any party would have been able to withdraw from making any further payments and the issue would be mediated with a named mediator. The Port does not present any evidence or argument that the insurers refused to pay its one-third share.[2]

On November 13, 2009, counsel for Defendant General Dynamics sent a letter to the DTSC, the Regional Water Quality Control Board ("Regional Board"), counsel for Lockheed Martin, and counsel for the Port in anticipation of the transfer of oversight of the Site from the DTSC to the Regional Board. (Defendants' Opening Brief, Exh. E). The purpose of the letter was to ensure that all parties understood that the transfer was "not intended to impact (the July 1998) Agreement in any manner." (Defendants' Opening Brief, Exh. E). Counsel for General Dynamics invited the parties to correct him if his understanding was incorrect. There is no evidence in the record before

---

[2] The 1998 Cost Allocation Agreement and the 2006 Interim Cost Sharing Agreement will be referred to as the "Agreements."

the Court that any party, particularly the Port, disagreed with this expectation.

### C. Port's Refusal to Fund Stressor Identification Analysis ("SIA")

In January 2010, the Regional Board took over as the lead agency overseeing the Site. The transfer of the investigation and remediation of the Site was agreed to by all parties. The Regional Board requested the parties to undertake additional sediment sampling at the Site in accordance with the Water Quality Control Plan, adopted in 2009. Although the Port paid its share of costs of conducting additional sampling in accordance with the Water Quality Control Plan, the Port has since refused to contribute any further funding for the SIA required by the Water Quality Control Plan and Order.

### D. Arguments

#### 1. Port's Alleged Conflict of Interest

##### a. Port's Arguments

The Port argues that it has a conflict of interest regarding funding the SIA because the SIA relates to an allocation of liability - the cause of the harm. The Port likens the SIA to a Court allocating cleanup responsibilities under the Comprehensive Environmental Response, Compensation & Liability ACT ("CERCLA").

The Port argues that the Regional Board points to two stressors that are not related to toxic pollutants: (1) physical alteration of the Site (i.e. impacts of dredging) and (2) other pollutant-related stressors. As to the first stressor, "physical alteration," the Port, not

Defendants, may be arguably responsible for the Site's physical configuration. If the sole cause of the impairment of the Site is the physical configuration of the Site (which, the Port argues, is what Defendants seek to prove by the SIA), then Defendants may avoid all liability. However, the burden is on Defendants to show that they do not have liability. The Port asserts that it should not have to partially fund Defendants' defense. As a result, the Port contends that a conflict of interest exists that prevents it from contributing to, and using a joint consultant in the SIA. Therefore, the Port should not be required to partially fund the SIA that might implicate its liability, while supporting Defendants' efforts to avoid liability. (Port's Opposition at 2-4).

The Port contends with regard to the second stressor, "other pollutant-related stressors," also shows that the SIA pertains to allocation of liability. The Regional Board will focus on a "single discharger," where appropriate, requiring the discharger to "reduce the pollutant loading into the sediment." *If* the Port's storm drain system is a source of "other pollutant-related stressors, the Board *could* address the drainage system, at great expense to the Port. Thus, the SIA *could* lead directly to liability/allocation.

### b. Defendants' Arguments

Defendants argue that the Port's alleged conflict of interest is speculative and was understood at the time the Agreements were executed. The Port claims that it cannot

fund the SIA because a conflict exists *to the extent that* the results may indicate that the Port is responsible for the alleged impairment of the Site *if* the second phase of the SIA (if needed) shows that certain contaminants contribute to the impairment more than other contaminants. However, until the SIA is complete, and if the parties are required to expend remedial costs, there is no conflict of interest.

Further, Defendants argue that the type of conflict to which the Port refers exists within all aspects of the investigation, including those already funded by the Port. Defendants assert that the investigation is to obtain data to use to determine whether remediation is required, and if so, by whom, to what extent, and at what allocated costs. The SIA is no different from the investigation already conducted in which the Port has contributed its allocated share without any objection regarding a conflict of interest.

Defendants also argue that the Port is contractually liable for one-third of the investigation costs at the Site. Defendants argue that there can be no dispute as to the contractual language in the Agreements because the language is clear and not susceptible to the Port's interpretation.

Defendants also contend that none of the parties is voluntarily undertaking the SIA. They are doing so pursuant to the Order. The Port previously supported the SIA as

documented in a Joint Case Management Conference Statement signed by all parties. (Defendants' Reply, Exh. B at 2).

Defendants also argue that the SIA is an investigation cost covered by the Agreements. The Agreements can have no other interpretation but that the SIA required by the Regional Board is investigative, not remedial. The SIA is an analysis consisting of (1) confirmation of chemical linkage and (2) identification of cause. The SIA is aimed at addressing the Site's conditions for purposes of creating an appropriate remedy. This statement is confirmed by the Regional Board's statements which make clear that the SIA is intended to distinguish between chemical and physical causes, not allocate liability among the parties. (Defendant's Opening Brief, Exh. F).

Finally, Defendants argue that at the time the Agreements were executed, the parties did not know the exact amount, type, duration, or cost of the investigations the regulatory agency would require, but all parties agreed to the equal one-third allocation.

> 2. <u>Port's Allegations That Regulatory Circumstances Have Changed, Making The Agreements Inapplicable To This Dispute</u>
>
> a. <u>Port's Arguments</u>

The Port argues that at the time the Agreements were executed, the DTSC never identified the Port as a polluter and it cited only four hazardous substances, all stemming from Defendants' operations. The Order did not mention linking harm at the Site to "physical alteration," or

1  "other pollutant-related stressors," other than toxic
2  contaminants. (Port's Opposition at 5-6).
3      The Port argues that the Agreements were limited to
4  the DTSC's Order, and to the Site only. At the time the
5  Agreements were executed, the DTSC was the lead agency
6  whose Order was the only Order expressly addressed in the
7  Agreements. (Port's Opposition at 5-6).
8      In 2010, the Regional Board took over administration
9  of the Site and issued three new directives. The direc-
10 tives resulted in incongruent results, requiring further
11 analysis. (Port's Opposition at 6). Despite the Port's
12 objections, Defendants hired a consultant and submitted a
13 plan for further analysis to the Regional Board. Thus, the
14 Port and Defendants are not sure what path the Regional
15 Board will take in the future, given the new directives
16 and their results.
17     The Port contends that since the Agreements were
18 executed, the regulatory landscape has changed. At the
19 time of the Agreements, there was one agency (DTSC) and
20 one order (of the DTSC). Now, there is another regulatory
21 agency (Regional Board) and its orders. The Port does not
22 believe that the Agreements can be construed to apply to
23 the Regional Board's new directives. (Port's Opposition at
24 6-7).

25              b. <u>Defendants' Arguments</u>
26     Defendants argue that the Port's position that the
27 Agreements are limited to landside investigation overseen
28 by the DTSC and are not applicable to the sediment inves-

tigation overseen by the Regional Board is untenable. There is no support for the Port's assertion. The Agreements pertain to investigations related to sediment; they are not limited to landside investigations.

Defendants argue that the transfer of authority from the DTSC to the Regional Board was agreed upon by the parties. The parties agreed that the work to be performed at the direction of the Regional Board would be deemed consistent with, and in satisfaction of, the terms of the Order. (Defendants' Opening Brief, Exh. D, para. 2, Exh. E). No party, including the Port, objected or expressed a different understanding of the implications of the transfer at the time it occurred. The Port should not be able to do so now.

### 3. Port's Interpretation of Agreement With Regard To Costs
#### a. Port's Argument

The Port argues that the 1998 Agreement states that if the Port's share of costs exceed $150,000, the prior approval of the Port Commissioners must be first obtained. The Agreement does not mandate the Port Commissioners' approval. Since 2006, the Port's investigative costs total at least $186,243. This does not include investigative costs for landside and groundwater investigations (which were not part of the 1998 Agreement) from 1998 to 2006. Assuming that the SIA is an investigative cost, the Port Commissioners have never approved any additional joint investigative expenditures. (Port's Opposition at 4-5).

b. <u>Defendants' Argument</u>

Defendants argue that the Port's invocation of the language in the 1998 Agreement regarding the Port Commissioners' approval for investigative costs over $150,000 is disingenuous because the Port was silent on this matter, which led Defendants to believe that costs over $150,000 were approved under the 1998 Agreement. At no time did the Port ever inform Defendants that its costs exceeded $150,000 and needed further approval of the Port Commissioners to pay more than $150,000. Pursuant to the Agreement, the time to have informed Defendants that the Port's costs were approaching $150,000 was when the costs were approaching $150,000, not after the costs exceeded $150,000.

    4. <u>Port's Arguments Regarding Specific Performance of the Agreements</u>
        a. <u>Port's Argument</u>

The Port argues that Defendants actually seek specific performance of the Agreements. But Defendants cannot obtain this remedy because they have already breached the Agreements in a material way. In particular, a "Project Coordinator" was to be designated by the Parties. That person was required to convey only "agreed to communications" to the lead agency, provide all parties with comment opportunities and advocate the parties' position to the lead agency. (Defendants' Opening Brief, Exh. B, para. H). The Port expressed its disagreement with Defendants moving forward with the SIA and with Defendants' position regarding "toxicity" readings at the Site.

If Defendants disagreed with the Port's position, Defendants' express remedy was to mediate the matter or to seek the Court's involvement if they deemed the Port to be in material breach. (Defendants' Opening Brief, Exh. B, para. 10). Instead, Defendants breached the Agreement by hiring their own consultant to conduct the SIA, communicating with the Regional Board without the Port's input, and without informing the Port of the outcome. (Port's Opposition at 8-9 and Exh. 7).

The Port proposes that Defendants pay for the SIA now, and if the Court finds, after trial or Motion for Summary Judgment, that Defendants are correct, they may obtain reimbursement, as noted in the 1998 Agreement (Port's Opposition at 9) (Defendants' Opening Brief, Exh. B, at 14, first full para.)

### b. Defendants' Argument

Defendants argue that they gave the Port every opportunity to address its refusal to contribute to investigative costs and participate in the SIA, as required by the Agreements. Defendants invited the Port to provide input in the SIA work proposal and the choice of consultants for the work. Further, the Port has provided input to the Regional Board concerning the process, and in Case Management Conferences with the Court, at which the parties discussed the SIA. The Port has been involved in the SIA process throughout this case, except for paying for it. The Port has worked with the Regional Board in reviewing the SIA work plans and has advocated for a

costly analysis. (Defendants' Opening Brief, Exh. F at 2). When the Port continued to refuse to meet its cost-sharing obligations, Defendants raised the issue with the Court. No "material breach" of the Agreements limits the Court's authority to decide this issue.

### E. Discussion

Defendants have presented the issue of the Port's liability for one-third of the costs of the SIA at the Site as a discovery dispute. However, the Court does not view this dispute as a discovery dispute. No discovery has even begun in this action at the specific requests of all parties. Instead, the 1998 Agreement specifically states as follows:

1. Each party shall be responsible for the timely payment of its one-third share directly to a contractor that performs work at the Site;

2. Each party's timely payment to a contractor that performs work at the site is an independent obligation;

3. If any party fails to pay its full share or any portion thereof of the costs to the contractor in a timely manner, the other parties shall make payments to the contractor in equal shares;

4. Any party that fails to pay its full share in a timely manner is in breach of the agreement; and

5. The other parties to the Agreement have the right to seek recovery of one-third of the payments made on behalf of the non-paying party, including interest, costs, and attorneys fees, in a civil action for reimbursement.

The Court views the 1998 Agreement as providing a remedy for Defendants to compel the Port to pay its share of the costs of the SIA. That remedy is a civil action in which Defendants may seek recovery of payments, interest, costs, and attorneys fees from the Port for its non-payment of its share of the costs paid to a contractor that performed work at the Site.

Such an action may seek specific performance of certain terms of the 1998 Agreement, or may simply seek reimbursement from the Port for its share of the costs Defendants paid to the SIA contractor for work performed at the Site. Further, the Port's arguments that it has a conflict of interest in paying its share of the costs of the SIA, that changed regulatory circumstances make the 1998 Agreement inapplicable, that it must seek Port Commissioners' approval before paying its share of the costs of the SIA, and that Defendants are not entitled to specific performance of the Agreements because they have breached other terms of the Agreements, can be presented in a civil action that may be brought by Defendants against the Port. At this time, such a civil action has not been brought by Defendants against the Port. The Court

leaves the parties to seek the remedy to which they specifically agreed.

IT IS SO ORDERED.

DATED: October 10, 2013

                                                                     Hon. William V. Gallo
                                                                     U.S. Magistrate Judge